UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAWN GUARINO GEDEON, | ) | CASE NO.: 4:22-CV-00441-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE: BENITA PEARSON |
| | ) | |
| vs. | ) | **BRIEF OF DEFENDANT FRENCHKO** |
| | ) | **IN RESPONSE TO SHOW-CAUSE** |
| MICHELLE NICOLE FRENCHKO, et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Now come Defendant Commissioner Niki Frenchko, by and through counsel, Mazanec, Raskin & Ryder Co., L.P.A., and hereby responds to the Court's order requiring her to show cause why she should not be held in contempt for the Facebook reply attached as Exhibit A.

**I.      BACKGROUND**

Plaintiff Dawn Gedeon filed this suit alleging ancestry discrimination, defamation and intentional infliction of emotional distress against her current employer, the Board of Trumbull County Commissioners, and against Commissioner Frenchko personally. Plaintiff is one of several current employees of the Commissioners' Office pursuing administrative and judicial remedies against Defendants because they are unhappy with Commissioner Frenchko's aggressive efforts to carry out the mandate from her electors.

Plaintiff filed this suit on March 21, 2022. Defendants' counsel was retained to defend the lawsuit on March 23, 2022 and completed waivers of service that same day. On March 28, 2022, Defendants' counsel received an email from Plaintiff's counsel at 9:32 a.m. informing her that the Court had scheduled a telephonic status conference for noon. Defendants' counsel did not know the reason for the call.

Concerned about the parties' respective rights to a fair trial and to limit the risk that pre-trial publicity might taint the jury pool, the Court indicated during the March 28, 2022 call that she intended to enter, *sua sponte*, a "gag order" against Commissioner Frenchko. The parties' counsel discussed the idea in broad terms. Defendants' counsel proposed that any order should bind all parties (not just Defendant Frenchko), and that the order should prohibit indirect and direct violations. Later that same day, the Court entered an order requiring "all parties to cease and desist from issuing public comment, either directly or indirectly, regarding matters touching on the above referenced case. The parties may engage in appropriate workplace communications that do not regard this litigation." (Doc. #5 – the "gag order.")

At the case management conference on July 18, 2022, Plaintiff's counsel notified the Court of an alleged violation of the gag order, citing a reply from Commissioner Frenchko to a constituent's Facebook post.[1] The Court ordered Commissioner Frenchko to file a brief showing

---

[1] On July 19, 2022, Plaintiff's counsel also complained to Defendants' counsel about a 22-second exchange during an hour-long radio interview of Commissioner Frenchko on July 8, 2022. He insisted that it be brought to the Court's attention in this brief. The allegedly offending excerpt follows:

> **Ron Verb**: Are there additional lawsuits filed against you currently?
>
> **Commissioner Frenchko**: Oh yeah, I think two more just came through. They're the same women who work in the office…they've probably filed dozens of them already … complaints. All of them have been dismissed. Uh, the civil rights commission has dismissed several of them and then they go through and file them again. And they're just gonna keep on getting dismissed.

https://www.iheart.com/podcast/265-ron-verb-podcasts-27844538/episode/ron-talks-with-niki-frenchko-99205180/ at 1:08:29-51.

Commissioner Frenchko never mentioned Dawn Gedeon in this statement, expressly or by implication. Yes, Ms. Gedeon is a "woman" who "work[s] in the office," but Commissioner Frenchko was speaking about the recently-filed complaints of Paula Vivoda-Klotz and Lisa Blair – cases in which the parties have not been enjoined from making public comment. Commissioner Frenchko did not violate the gag order by making this statement, and to the extent that the Court believes she did, the violation was inadvertent. She could not have known that she was unilaterally

cause why she should not be held in contempt of the gag order for her reply. [2]

## II.    LAW AND DISCUSSION

The source of the Court's contempt power derives from 18 U.S.C. § 401, which provides:

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as--

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

**(2)** Misbehavior of any of its officers in their official transactions;

**(3)** Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.

This Court's order implicates the third category of contumacy which, "[b]y its express terms, … is triggered only by 'disobedience or resistance' to a court's order. *United States v. Koubriti*, 305 F. Supp. 2d 723, 740 (E.D. Mich. 2003) (citing *In re Smothers,* 322 F.3d 438, 441 (6th Cir.2003)). In order to rise to the level of contempt, he "act of disobedience or resistance must be willful—that is, a 'deliberate or intended violation' of the court's order, 'as distinguished from

---

prohibited from making public comments about internal complaints, claims and lawsuits, particular those brought by employees who are <u>not</u> reciprocally bound by the Court's gag order. Defendant further incorporates the constitutional arguments set forth herein.

[2] It is unclear what kind of sanction the Court is considering. A criminal contempt sanction is punitive and seeks "to vindicate the authority of the court." "Criminal contempt is a crime in the ordinary sense," and "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings…," including proof beyond a reasonable doubt. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994) (internal citation omitted). "In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.* at 827. Commissioner Frenchko's alleged contempt cannot be purged, so it would appear that the Court is considering criminal contempt sanction, which is governed by Fed.R.Crim.P. 42.

an accidental, inadvertent or negligent violation.'" *Smothers,* 322 F.3d at 442 (internal quotations and citations omitted). In addition, the court's order must be reasonably definite and specific, and the alleged violator must have been on notice of this directive." *Koubriti*, 305 F.Supp. 2d at 740. "It is well settled that for a person to be held in contempt of a court order, the court order must contain the specificity necessary for the person to 'readily know exactly what duties or obligations are imposed upon him.' Otherwise stated, '[a] trial court cannot impose contempt sanctions on a party if the party cannot know whether or not its actions violate the trial court's order.'" *In re Contempt of Scaldini*, 2008-Ohio-6154, ¶ 18 (citations omitted).

    A.    **THE CONTENT OF COMMISSIONER FRENCHKO'S REPLY DID NOT VIOLATE THE GAG ORDER.**

Commissioner Frenchko is alleged to have violated the gag order by responding to a constituent's request for the names of the Commissioners' Office employees who were suing Frenchko so that the constituent could send them "a box of big girl panties." Before providing their names, Commissioner Frenchko explained, "I can tell you who they are because it's public record, but I don't condone sending them anything at work…." [3]

As an initial matter, Defendant submits that Commissioner Frenchko's disclosure of the women's identities did not constitute a "matter[] touching on the above referenced case." A "matter" is "a subject of consideration, disagreement, or litigation: as (a) a legal case, dispute, or issue [a within the court's jurisdiction] often used in titles of legal proceedings [ of Doe] see also in

---

[3] Defendants suspect that Plaintiff may have violated the gag order and discussed the outcome of the case management conference with her co-workers. The Court's orders from the July 18, 2022 case management conference did not issue until 6:13 p.m., yet the Tribune Chronicle's *print edition* contained a lengthy story about it the next morning. The timing suggests that someone may have alerted to media (in advance of the order issuing) to the alleged gag order violation.

re; (b) one or more facts, claims, or rights examined, disputed, asserted, proven, or determined by legal process.[4] It is the second definition that applies here.

The identity of parties to a lawsuit is not a "matter related to the litigation." The plaintiffs' identities are not a topic, dispute, issue or subject of consideration or disagreement in this lawsuit. This factual information is publicly available on the Court's docket, and the names of the women have been repeatedly reported by the Tribune Chronicle, other print media, radio and television broadcasts, and various social media sites. Unless a plaintiff filed anonymously or pseudonymously, identifying the plaintiff to a lawsuit is no more contentious than admitting that litigation exists. Commissioner Frenchko's factual reply did not interfere with the administration of justice, neither did it "taint" prospective jurors.

**B. COMMISSIONER FRENCHKO'S ALLEGED VIOLATION OF THE GAG ORDER WAS NOT WILLFUL.**

In order to hold a party in contempt, the "act of disobedience or resistance must be 'a deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation." *In re Smothers,* 322 F.3d 438, 441-442 (6th Cir. 2003). It is readily apparent from the language of Commissioner Frenchko's reply that any alleged violation of the gag order was absolutely unintentional. She wanted to *avoid* a possible violation of the gag order and preemptively explained her reasoning for why her disclosure did not violate the injunction. She told her constituent, "I can tell you who they are [only] because it's public record…."

Further supporting the absence of willfulness is Plaintiff's admission that she could not tell whether Commissioner Frenchko's reply violated the gag order. (Exhibit B – 7/14/22 email from Gedeon to her attorney asking "Did frenchko violate gag order by posting this on her social media

---

[4] https://dictionary.findlaw.com/definition/matter.html.

Facebook page and putting my name i[n]???").” *See In re Contempt of Scaldini*, 2008-Ohio-6154, ¶ 18 (citations omitted) (trial court cannot impose contempt sanctions on a party if the party cannot know whether or not its actions violate the trial court's order). Plaintiff's admission brings Defendant to her next point – the constitutional infirmities in the gag order.

> C. **THE SCOPE OF THE GAG ORDER IS UNCONSTITUTIONALLY VAGUE AND UNENFORCEABLE.**

Generally speaking, "'the validity of an underlying injunction is not an issue in a criminal contempt prosecution' under the collateral bar rule…." *United States v. Hendrickson*, 822 F.3d 812, 821 (6th Cir. 2016) (citing *Walker v. City of Birmingham,* 388 U.S. 307, 315–20 (1967)). When, however, an injunction is "transparently invalid," the collateral bar rule does not preclude a challenge to the order's validity. *Hendrickson*, 822 F.3d at 819 (quoting *Walker,* 388 U.S. at 315, 87 S.Ct. 1824). [5] Defendant contends that the gag order is transparently invalid on its face and as applied because it is too vague to give the parties sufficient notice of what speech the order proscribes.

The language the Court used in its gag order derives from a state appellate court decision in *In re Contempt of Scaldini*, 2008-Ohio-6154. In that case, the trial court issued a gag order that prohibited the parties, including Scaldini (a university president), from issuing public comment on the "pending status of the litigation" involving allegations that the defendants wrongfully removed several members of the board of trustees in order to force Myers University to close. Shortly after the gag order was issued, a newspaper printed a letter to the editor written by Scaldini in which he

---

[5] Like the Sixth Circuit in *Young*, Defendants respectfully acknowledge "the heavy responsibility resting upon the district judge to take such reasonable measures as may be required by the circumstances to obviate the possibility of contamination of the trial process" and "entertain no doubt that the [Court] entered the order in the good faith belief that [her] duty required it because of the nature of the case itself, the parties connected with it, and the publicity which the trial would be likely to attract." *Id.* at 241.

apparently mentioned the university's financial issues and responded to attacks on his reputation. The trial court held Scaldini in contempt of the gag order. On appeal, the Eighth District reversed and remanded.

> We find that the gag order in this case lacked the specificity necessary to find Scaldini's conduct violated the gag order. The gag order prohibited comments about the "pending status of the litigation." It did not prohibit the parties from issuing any comments to the press **that touched upon matters related to the litigation**. There is no evidence before this court that Scaldini's letter commented on the status of the litigation. Further, from the record it cannot be said that Scaldini engaged in conduct prejudicial to the administration of justice.

*In re Contempt of Scaldini*, 2008-Ohio-6154, 2008 WL 5049956, ¶ 19 (bold added).

Defendant does not believe that the *Scaldini* court offered the bolded language as an example of a sufficiently specific gag order. Rather, the court used that language to explain -- by means of comparison -- why Scaldini's comments fell outside the scope of the gag order. That is, the *Scaldini* gag order was *too specific* to encompass the defendant's allegedly contumacious conduct -- hence, the court's conclusion that "there is no evidence before this court that Scaldini's letter commented on the *status* of the litigation."

### D. THE GAG ORDER IS AN UNCONSTITUTIONALLY OVERBROAD PRIOR RESTRAINT ON THE PARTIES' FIRST AMENDMENT RIGHTS.

If the gag order in this case is so broad as to prohibit the parties from disclosing inconsequential facts and those that are already publicly available (including the names of the women suing her), then Defendant submits that the injunction is unconstitutionally overbroad.

In *CBS Inc. v. Young*, 522 F.2d 234 (6th Cir. 1975), a news organization challenged the constitutionality of a gag order issued against the parties to a civil case arising out of the National Guard's shooting deaths of four students during protests at Kent State University. The injunction read, in relevant part:

> It is further ordered that counsel for both the Government and the defendants, as well as each and every defendant herein, make or issue no statements, written or

7

> oral, either at a public meeting or occasion, or for public reporting or dissemination in any fashion, regarding the jury or jurors in this case, prospective or selected, the merits of the case, the evidence, actual or anticipated, the witnesses, or the rulings of the court. This order shall remain in force during the pendency of this action in this court. No person covered by this order shall avoid its proscriptions by actions which indirectly, but deliberately, cause a violation of this order. Violation of this order subjects the transgressor to appropriate sanctions by the court.

CBS argued that this gag order constituted an unconstitutionally overbroad prior restraint of the parties' speech. The Sixth Circuit agreed.

> The order suffers equally from the infirmity of overbreadth as to the subject matter or content of any prohibited discussions. **According to its literal terms no discussions whatever about the case are permitted by the persons upon whom the ban is placed whether prejudicial or innocuous, whether subjective or objective, whether reportorial or interpretive**. We find the order to be an extreme example of a prior restraint upon freedom of speech and expression and one that cannot escape the proscriptions of the First Amendment, unless it is shown to have been required to obviate serious and imminent threats to the fairness and integrity of the trial.

*Id.* at 239; *see also*, *United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987) (gag order issued against defendant congressman in criminal action was unconstitutionally overbroad because it "was neither narrowly tailored nor directed to any specific situation. Nor was there any specific consideration of the less burdensome alternatives of voir dire, sequestration or change of venue."); *But see, United States v. Koubriti*, 307 F. Supp. 2d 891, 899 (E.D. Mich. 2004) (observing that since the Supreme Court's decision in *Gentile v. State Bar of Nevada,* 501 U.S. 1030 (1991), "it is only when a court imposes a blanket prohibition on speech of trial participants or imposes a restraint upon the press that the court must explore and consider less intrusive alternative means.").[6]

---

[6] In *Gentile*, the Supreme Court upheld the constitutionality of a state court rule that prohibited a party's attorney from making extrajudicial statements that he knew or reasonably should know to have a "substantial likelihood of materially prejudicing the adjudicative process."

8

Clearly, the Court has the right and responsibility to ensure that this case is not tried in the media. However, the gag order issued on March 28, 2022 is too broad in scope. It is a blanket proscription on the parties' First Amendment rights to speak about their workplace, co-workers, elected officials, substantive issues facing Trumbull County, this litigation and the claims, charges and litigation brought by others.[7]

### E. THE GAG ORDER INFRINGES ON THE SEPARATION OF POWERS.

Also implicated by the gag order is the doctrine of separation of powers.[8] This Court represents the judiciary, but the Trumbull County Commissioners, all of whom are elected officials, have an equally important responsibility as legislators and quasi-executives to represent their constituents and communicate with them on matters of public interest. The Court must be tolerant of those political functions and not impede them except to the extent that the comments present a "clear and present danger" of "actual prejudice or an imminent threat."[9] *United States v.*

---

[7] The issues involved in this case are recurring themes in the day-to-day operations of the commissioners' office. Conflicts will continue arise because commissioners' office employees remain employed and Commissioner Frenchko remains a commissioner. As we enter campaign season, Commissioner Frenchko must be free to express her view that the lawsuits have been brought as political weapons to prevent her re-election. Among other things, she should be permitted to remind constituents that all three of the civil stalking protection orders sought against her were denied and that the administrative charges brought against her have been dismissed. She should be permitted to speak about her arrest during a commissioners' meeting earlier this month. To enjoin Commissioner Frenchko from speaking publicly about these topics because they may "touch on matters related to" this suit effectively enjoins the constituents on whose behalf she was elected to speak. Further, it eviscerates her ability to campaign for re-election.

[8] Federalism concerns are also implicated because a *federal* judge is restraining the speech of three *county* commissioners who collectively comprise the legislative and executive branches of the county. *See Reddick v. Coshocton Cty. Reg'l Airport*, 2005-Ohio-2169 ("We are unable to definitively determine whether a county board of commissioners is the functional equivalent of the executive branch or the legislative branch of the government, or potentially a combination of both.")

[9] *Koubriti* suggests that, since *Gentile,* the "clear and present danger" standard is applicable only to injunctions against the press. *Id.* at 899. Defendant respectfully disagrees. *Gentile* focused on

9

*Ford*, 830 F.2d 596, 598 (6th Cir. 1987) ("We see no legitimate reasons for a lower threshold standard for individuals, including defendants, seeking to express themselves outside of court than for the press.")

In *Ford*, the Sixth Circuit considered whether a gag order imposed against a defendant congressman "constitutes an abridgement by the judicial branch of the authority of the legislative branch of government." (The gag order in *Ford* was almost as broad as the gag order issued in this case. The injunction prohibited the defendant congressman from making any comments about the case except to deny his guilt and those made in furtherance of legislative duties.) The Sixth Circuit agreed with an amicus brief that raised concerns about the order's effect on the separation of powers, explaining, "the doctrine of separation of powers—a unique feature of our constitutional system designed to insure that political power is divided and shared—would be undermined if the judicial branch should attempt to control political communication between a congressman and his constituents. It would tend to undermine the representative nature of the democratic process and the legislator's responsibility to the electorate to account for his actions. *Id.* at 601.

The Sixth Circuit further explained:

> The protection of political speech … is at the core of the First Amendment. Here the defendant, a Democrat, a black congressman who represents a largely black constituency in Memphis, is entitled to attack the alleged political motives of the Republican administration which he claims is persecuting him because of his political views and his race. One may strongly disagree with the political view he expresses but have no doubt that he has the right to express his outrage. He is entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress. He will soon be up for reelection. His opponents will attack him as an indicted felon. He will be unable to respond in kind if the District Court's order remains in place. He will be unable to inform his constituents of his point of view. And

---

the trial court's right to control extrajudicial comments by a party's attorney and the conduct of attorneys and parties in court.

> reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance.

*Id.* at 600–01. Thus, the court remanded the case to the trial court to issue a more tailored order.

The same political considerations exists in this case. Commissioner Frenchko believes that she has a clear mandate from her voters to disrupt "business as usual" in Trumbull County. She further believes that her mandate has unsettled Commissioners' Office employees to the point that they will use any means necessary to obstruct her reforms and ensure that she will not be re-elected.[10] To silence Commissioner Frenchko is to silence the constituents who voted for her. It also leaves Commissioner Frenchko powerless to address public attacks on her reputation by other plaintiffs, witnesses, media sources and members of the public who are not bound by the gag order – **most notably, Plaintiff's own brother who has campaigned twice to be elected Trumbull County commissioner and is likely to try again**.

In a few months, Commissioner Frenchko will start campaigning for re-election, and these claims and lawsuits will be weaponized against her. She should not have to campaign with the sword of Damocles (a possible contempt violation) hanging over her head. Neither should county constituents have to decide in a vacuum whether to support her candidacy. Commissioner Frenchko should be permitted to answer to her constituents for these lawsuits and claims as long as her comments are otherwise lawful (*e.g.*, not defamatory). *Id.* at 606 (Nelson, J., concurring) ("Regardless of whether and to what extent an indicted official's personal interest in offering a public defense of his conduct may be protected by the First Amendment, it seems to me that the

---

[10] This is not a matter of speculation. One of the Commissioners' Office employees, Shara Taylor, was the administrator of a Facebook page that targeted Commissioner Frenchko. (Exhibit C.) Taylor, a classified civil servant, also publicly advocated for Commissioner Frenchko's recall. (Exhibit D.)

interests of the public, in a representative democracy, militate strongly in favor of letting the official speak freely.") [11]

### III. CONCLUSION

For the reasons stated above, Commissioner Frenchko respectfully submits that she did not violate the gag order and that the gag order is unconstitutional, both facially and as applied. Commissioner Frenchko respectfully requests that the Court lift the gag order entirely or amend it to reflect only the narrowest restrictions on the parties' speech.

Respectfully submitted,

MAZANEC, RASKIN & RYDER CO., L.P.A.

*s/Kathleen M. Minahan*
KATHLEEN M. MINAHAN (0064989)
EDMOND Z. JABER (0096355)
100 Franklin's Row
34305 Solon Road
Cleveland, OH 44139
(440) 248-7906
(440) 248-8861 – Fax
Email: kminahan@mrrlaw.com
ejaber@mrrlaw.com
*Counsel for Defendants*

---

[11] "In civil litigation, the Seventh Amendment guarantees only a 'trial by jury' whereas in criminal litigation, the Sixth Amendment guarantees an 'impartial jury.' Accordingly, this impartial jury requirement in criminal proceedings justifies restrictions on attorney speech in criminal litigation which would not be justified in civil proceedings. Moreover, the length of civil litigation tends to be much more prolonged than criminal litigation due to the priority granted to criminal matters by the judicial system because of the constitutional right to a speedy trial. Likewise, discovery in civil litigation is much more extensive than the discovery which is permitted in criminal litigation. Hence, restrictions on attorney speech in connection with civil litigation may result in a more serious loss of First Amendment rights than restrictions in connection with criminal litigations. Finally, civil proceedings may involve significant social issues which should not be hidden from the public." *Wachsman v. Disciplinary Couns., Supreme Ct. of Ohio*, No. C-2-90-335, 1991 WL 735079, at *10 (S.D. Ohio Sept. 30, 1991). Although *Wachsman* addressed limitations on counsel, the principles are even more compelling when applied to a civil party's First Amendment rights.

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2022, a copy of the foregoing Defendant's Brief in Response to Show-Cause Order was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/Kathleen M. Minahan*
KATHLEEN M. MINAHAN (0064989)
EDMOND Z. JABER (0096355)

*Counsel for Defendants*
